As you may recall, I'm Walter Boyacki, and I represent Commander Tobar and the rest of the people on his boat. I wanted to thank the Corps for having us again. Unfortunately, from the last time we were here, nothing much has changed. My fishermen are still not compensated. Our mediation failed. Commander Tobar was not reappointed as the naval attache to the United States. I still haven't been able to take one deposition. We have no discovery in this case whatsoever. And the Americans got thrown out of the Air Force base at Manta in Ecuador. And I guess my clients think that they should have probably got a better lawyer, I think. So here we are again, but I see that we really have a small change, and the panel has changed, because we lost Judge Fletcher. And I would suspect there's a warm spot in heaven that she's occupying. We all think that way, too. We miss her a lot. I hope she's looking down on me at this time, because I know what her opinion was in this case. Anyway, what has happened since is we sent the case back to San Diego, and I think I did a lousy job on the reciprocity issue, and that's what we sent it back for. At least that's what I thought it was sent back for. Counsel, let me get to a place where I have some questions about where we are now. There really are potentially two issues here. One is whether there's reciprocity, and if there is, such as to meet the statutory requirement, does the discretionary function immunity doctrine apply? And I'd like you to talk to me about the discretionary function exception, and what is the policy specifically or other regulatory or statutory criterion that you believe takes it out of that doctrine? Judge, I think you move very quickly into negligence on this case. If you look at the documentation that was provided to me, and don't forget, they wouldn't let me question any of these people, you could see that, number one, they didn't have an approximate cause. They had the search issue came up in Washington, D.C. That's where the directive came from. The directive came from the American government or the Coast Guard and the Navy in Washington, and they radioed that to these people on this boat 300 miles out into the Pacific. So if you look at your cases that have been done on public vessels, the Thomason case, the Canadian Aviation, the Tag Homey, all of these different cases that you could see, what did they do? They violated their own regulations. They violated statutory regulations. They violated their own contract, and we have previously briefed that, as you can see, with, like, the Bell case, that once you make a contract, discretionary function is then gone. Once you make the decision to search that was made in Washington, D.C., the implementation of that decision, according to the case law, is subject to negligence subject. The discretion is then gone when you're implementing the policy that's already been made. So could I just stop you there? Yes, ma'am. Counsel, you made a brief argument along these lines on pages 31 and 32 of your opening brief. Yes, ma'am. About, you know, there's the question of whether a statute or a regulation prescribes certain conduct, but now focusing specifically on the third option, which is whether there's a policy that really took the discretion out of the Coast Guard's hands, is, I think, what you're referring to now. Yes, ma'am. And that's the argument you make just in passing on page 31, and then on 32 you talk about the Bell case. Yes, ma'am. And that case relies, I think it's from the Tenth Circuit, that relies upon a contract, really a construction contract, where the government, the United States government, promised to perform a construction project in a certain way and then didn't, right? Yes, ma'am. Okay. So are you arguing here that, and I know you're not bringing a contract claim, but is your argument that because this letter from the attache said they were going to do a certain thing, board this vessel in a certain way, that that removed the discretion? Is that what we're talking about? And the letter keeps saying that any damage we'll pay for and we will indemnify. Okay. Very clear. I just want to make sure that I'm clear that you're not relying on a statute or a regulation. You're relying on the letter that came from the attache. Yes, ma'am. And also there's an agreement between the Ecuadorian government and the American government for operation on Manta in Ecuador. Well, yes, but the earlier case considered that as well. Right. Is there anything else other than the letter, and I understand your argument about the other agreement to operate the base, but do you have anything else to show us that there was a policy that would exempt this case from the discretionary function doctrine? What I was trying to figure out, if you recall, the commander Ellis, the guy who writes the letter for the embassy, signs one of the affidavits for discretionary function here. I couldn't take his deposition. I wanted to find out from him, have you paid other people before? Did you pay anybody else that you've done this to? Well, what difference would it make if they had? Let's say they had. Policy again. If the policy was, for example, when I was in the Army, I was at one of the jobs I had was I had to sign claims. I could tell you what the policy was on claims. Well, counsel, the fact that they might have paid in another situation doesn't necessarily establish that there was a policy to pay. Each claim might differ from each other claim. Judge, you're 100 percent right. What there may have been, though, is a local SLP that they would pay claims for this. Example, we would pay – remember the elephants that they sent, the ceramic elephants they sent back from Vietnam? Every single claim we had, somebody busted one of the elephants. Our SLP was to pay on the elephants and be quiet about it. They weren't worth 75 bucks, which would be about $300 equivalent now. But the policy was very clear. We would pay on the elephants. What if there wasn't an across-the-board policy? What if all there is is that letter? Judge, I wanted to find that out. Okay, but set aside the discovery issue for now, if you would, please, counsel. Because this is a separate question. If there's just the letter, is that enough? I think it's enough, and I think behind it was the policy. I cannot imagine a lieutenant commander having the authority to write that without a policy. That just runs contrary to anything I've ever seen working in Army claims for years. You would not see somebody write a letter like that. Example again, I had authority of $25,000. If you had a brain-damaged baby, you came to the right guy to give you $25,000. That's all the authority I had. See, so I would tell those people, you don't want my authority, go someplace else. And that's policy again. There's no way to know that, except my guess was when I saw that guy's name, I said, this guy isn't high enough to set this policy of reimbursing and indemnifying for damage. It's too much money. He doesn't have that kind of authority. The levels of authority would be, I would assume, just like any levels of authority when you're working with the government. Most agencies go up to $100,000 and then pass that through going into the Justice Department. See, so I knew there was something else there. What it was, I couldn't find out. So I knew they violated their own policy. Whatever it was, I knew the contract stands. And to tell you the truth, I thought they looked real bad. Why would they tell these people they were going to do that and not do it? It runs contrary to everything that I think the American government should stand for. And when they sent me down to see if I could do anything on that agreement with Manta, it was very, very difficult to try and explain all that. It was very difficult. And, you know, at some point, the American government, whoever was in charge, whether it was the ambassador or the chief liaison legal officer, whatever, would have been able to tell us, what is your policy? What are you doing with similar cases, the same case, any claims, anything else done by the American government in that situation? And still had no earthly idea what it was. So if, in fact, they were negligent in the implementation of the policy, negligent in enforcement, in this particular case, they never had probable cause to search anybody. The closest they got was some other boat, had drugs on it. And then here, if you would get to the implementation, you get to the boat, you search the boat, there's nothing on the boat. Do you need to drag the boat 300 miles for eight days? You have no food for these people? They went ahead, and these are written briefs, they went ahead and had to give them K-rashes, because they had nothing to eat. There was three children on the boat. So at some point, the argument was among the crew, American crew, let these guys go, because the policy had already been made, the implementation of the policy, but this is just flat wrong. Counsel, did you want to save some time for rebuttal? Yes, ma'am, three minutes. Oh, okay. Keep right on going. Okay. I think pretty much if they violate their own regulations, they violate statutes, they had no probable cause, they really had nothing here, and they should have stopped when they saw, this is like a policeman searching somebody in the street and they have nothing. You don't take the guy in for possession of a weapon if he doesn't have one. And this is what happened in this case. So it's a real travesty case. And our problem was we thought that this court had addressed it, so when we send it back to San Diego and Judge Hayes says, I want to deal with discretionary function. And so I said to him, I said, I thought we already did all that. He said, no, I want you to do it again. Okay, we'll do it again. So we did it again. But once again, I said, can I have some discovery here? Because I can address this issue a lot better if I get some discovery here. Because the jurisdiction and the discretionary function are kind of tied together in this case. It's very hard to separate them out and to see who did what where. What's this agreement that the embassy was trying to say or wasn't saying? Was it negligent? Was it a lie? Or was it we're going to blow these guys off and the heck with them? Which was maybe the exact situation. We wanted to move this back and forth. May I ask you a question? Yes. This court question. Has our government denied that the commander passed on the information that the embassy would identify your client? Has that turned out there was nothing on the ship? Yes, sir. That's what they understood the agreement to be. There was nothing on the ship. They did a tremendous amount of damage to the ship. And, you know, for example, they searched. Since they couldn't find any drugs, they went then into the fuel tanks to see if they were in the fuel tanks. Counsel, that wasn't Judge Prakerson's question. His question. This is pretty close. Pretty close. But so Lieutenant Commander, with our embassy, this attache, he was a naval officer or Coast Guard officer? Yes, sir. Naval, I believe. Coast Guard attache. Ellis. I'm sorry. That's commander. Ellis, yes. Commander Ellis, he did say to your clients that if it all turned out to be a big mistake, there was nothing on the ship except rotten fish, that they would identify your client. Yes, sir. That's exactly what it says. Is anyone disputing that? Yes. I heard the voice. I don't know if it was up high or down below. He's behind me. Yeah, you'll have your chance in just a moment. Okay, Mr. Boyacki, you have a short time left for rebuttal. Yes, ma'am. Mr. Blaze, now it's your turn. I'm sorry, Your Honor. Wait until you're up here so that Judge Prakerson can hear you as well. I thought Judge Prakerson was asking the government whether we contested that. Yeah. And we do. This Judge Graber and — Would you introduce yourself for the record, please? Oh, I'm sorry. Scott Blaze for the United States. Thank you. The United States. I'm sorry, Your Honor. Yeah. When I referred to the previous appeal, if it's all right with the Court, I'll call it Toe Bar One. In Toe Bar One, Judge Graber pointed out that this letter was not sent to plaintiffs. It was not a communication between Commander Ellis and plaintiffs. It was sent to the government of Ecuador. Yes, but that raises another question in my mind regarding this discretionary function issue. The U.S. Coast Guard Maritime Law Enforcement Manual, which is in the record as Exhibit 12, I believe, it's got lots of different markings on it. But would you agree that that constitutes a kind of policy? The manual. I think the manual, yes, refers to the policy. Well, is it itself a policy so that if it were violated, then there would be the potential to have not discretionary exception? I think the policy is set out in the congressional statement. Counsel, that's not answering my question. I need a yes or no answer to this. So you're saying that the Coast Guard manual is not a policy? I'm saying the Coast Guard manual sets out the procedures that the Coast Guard may follow in support of a policy which is set out in at least two places, a congressional statement as to the policy with respect to interdiction of illegal drugs. And the U.N. Convention Against Illicit Traffic in Illegal Drugs, et cetera. The law enforcement manual is the manual which deals with the procedures available to and the decisions to be made by the Coast Guard in support of those policies. Well, the reason I'm asking you specifically, and let me, again, I'm having trouble with knowing how to deal with this page numbers, but it appears to be an exhibit to the Declaration of Brad Klesserman at tab B, page 505. And it's a section called Flag State Authorization. And it says, among other things, when acting pursuant to flag state authorization, the boarding state may not exceed the terms of the authorization. Such authorization may be contained in a preexisting written agreement or may be provided on an ad hoc basis. And that's the end of the quote. My question to you is whether this letter that's been the subject of discussion is part of the terms of the authorization that Ecuador gave in this particular instance. And if so, then it would seem to me to be at least potentially a policy. Because the letter says if there are no drugs on board and there are damages or losses sustained, and then leaving some things out, the owner will be compensated. And that seemed to me to be at least potentially an underlying premise of the Ecuadorian authorization of this operation. And if so, why isn't that a violation of this policy? Well, I will answer that. But first, the letter is pursuant to the procedures in the U.N. Convention with respect to the proper term is against illicit traffic in narcotic drugs. Let me interrupt you. Was that letter went out from our government? To the government of Ecuador. The Ecuadorian government. And we said that if there are no drugs on board and there are damages and losses sustained by the vessel in accordance to the U.S. laws and in a manner complying with international laws, the owner of the vessel shall be compensated as long as neither the vessel nor the crew have been involved in illicit actions. Well, what could be clearer than that? I'm not saying it's not... We're telling the Ecuadorian government. We sent this letter to Rear Admiral Eduardo Navas Najera that if we bring the ship in, you will allow us to bring the ship in, if there are no drugs on that vessel and neither that vessel nor the crew have been involved in illicit actions, that we're going to compensate for any loss. Now, you know, do we renege on our promises? Is that what our government is doing? No, Your Honor, it's not what our government is doing and... What are we doing? Explain it to me. If I may explain, during the argument the first time... Explain it to me without digressions. Just come right to the point and explain it to me. After a Standard Form 95 was filed with the Coast Guard by all the plaintiffs, I believe they filed individual Standard Form 95s, that was filed with the Coast Guard Claims Service before a suit was filed. The Coast Guard Claims Service then sent out the standard letter requesting documentation to support the damages sought by plaintiffs. Plaintiffs' lawyers' response to that question, asking for simple support for the millions of dollars you're asking for, is, and I have a copy of his letter with me, basically, quote, you don't know anything, we'll sue you in the Southern District of Texas. Now, that doesn't sound to me like the government trying to renege on its obligation. If it was an obligation, the government was responding to administrative claims, asking for please give us support and we'll process these claims. And the plaintiff's answer was, nope, we're not giving you credit. But counsel, if that's the only quarrel between the parties, then it's a mystery to me why mediation didn't work. Because there obviously is information out there, and that's what I suppose one of the opportunities that is now behind us. And it doesn't matter. It didn't work. So we're here. But the position you're taking in the present appeal has nothing to do with any defalcation in the claims process. Now you're saying this is all covered by the discretionary function exception. And I would still like an answer to my question, which is why isn't this letter a part of the terms of the authorization that the Coast Guard manual states may not be exceeded? Well, actually, I'm not trying to avoid the question. I don't, the way you just put it, I don't quite understand it. Well, let me see if I can explain it a different way. And I appreciate that this is somewhat convoluted. The Coast Guard manual says, among other things, if we board a vessel that belongs to another, that's under the flag of another nation, we shall not exceed the terms authorizing that boarding. So, for example, if the state said you may only have one vessel come close to our vessel and we send 10, that violates this. And here I guess my question is why isn't this letter stating that if an innocent person is mistakenly targeted, innocent person is mistakenly targeted from your flagship, we'll compensate them. Why isn't that part of the terms of the authorization that Ecuador allowed us to do this on the condition, on the understanding that an innocent party, as distinct from a drug dealer, wouldn't suffer a financial loss? Well, my understanding of the discretionary function, and it is a complicated area, and it's possible that I'm not completely correct, is that part of the balancing process in allowing negligence or abuse of discretion is precisely that sometimes you're not going to get it right. And if an innocent person is injured during, I forget which case it was, but the example was, there's drug interdiction, the interdicting vessel hits an innocent bystander standing on the pier with a line thrown, nobody would say that's part of what could be expected. But when you interdict vessels at sea with a reasonable suspicion that they might be carrying illicit drugs, you have to expect that you may make a mistake. Yes, and that's the reason it seems to me why this letter is so important, because it assures the Ecuadorian government, that is, it's part of the conversation between governments, that if there is a mistake made and an innocent person is caught up in this, that they will be compensated for their financial losses. And that's completely consistent with getting all the bad guys there are out there, and it doesn't depend on a conclusion that there wasn't a probable cause here or reasonable suspicion. I guess I'm just having a hard time seeing why that isn't part of the limitations that the two governments placed upon the right to board an Ecuadorian ship, which we otherwise do not have. Well, beyond what I've said, Your Honor, I think this falls within the type of policy which is set out not only by the Ecuadorian government, not in the agreement from the letter between the Ecuadorians, but it's set out in the treaty, that there will be communications, and if every time there's a communication between, in this case, Ecuador and the United States, it may be, but I don't think that that rises to a mandatory policy that can be violated to defeat the discretionary function. How do you distinguish this case from Bell? This Tobar case? I'm not, to be perfectly honest, I'd have to look at my notes to recall which case Bell is, is that all right? Sure, but I can probably help you out a little. In other words, let's just say for purposes of argument that I would agree with you absolutely that if we were talking about any other law enforcement, search or seizure activity, that that would typically fall within the discretionary function exception, and that the difference that I'm focusing on is this letter. So if there had been no letter, let's say, and there had been this decision made in Washington that this particular vessel was going to be towed and searched and that maybe some damage would be done in the process, because after all, that happens sometimes, that that would be as far as it went. And the discretionary function doctrine would apply. But I'm focusing on this letter and asking why isn't it an expression of a policy for how the government was going to conduct this particular activity, so that the government's discretion was limited. And the Bell case seems to me to be quite analogous, because that's the case I was talking about earlier with opposing counsel, where the government had a contractual obligation to build this, I think they're modifying a reservoir, in a certain way, and the contract called for the government to move a pipeline. And then the government decided not to move the pipeline, apparently, and somebody got hurt. And I think in that case, the Tenth Circuit said, well, since you made this contractual commitment to do this otherwise discretionary function in a certain way, that limited the scope of your discretion. And the government, I believe, was held liable in that case. That's why I'm poking and prodding at that to see whether or not this letter in this case makes a difference. Well, I don't have any more to add than what I've said. I could repeat it, but I don't think that's what the Court wants. Are there any other questions right now? We haven't talked about reciprocity. I assume there's a reason for that, but would the Court suggest we not bother? Well, you have half a minute, and you should use it any way you would like. Well, I'll stick with reciprocity. Putting aside, because I've given the best answer I can give with respect to the letter, I think this is a perfect case based on the policy set out in our briefs, the Treaty and the Congressional Statement of the Importance and the Policy Nature of Interdiction of Illegal Drugs, and the nature of the MLEM Manual and the CDAMIO Manual, both of and 14 U.S.C. 89. To me, this seems to be a particularly clear case for the discretionary function, exception to apply. And that's all. Thank you, Counsel. Your Honors, I believe I have a whole minute. So what I would like to tell you is the disparaging remarks about counsel, me, on the claims process on Standard Form 95 is absolutely untrue. I have, in my career, brought cases against the United States in over 500 times, and some of the agencies will play, some of them will not. The Coast Guard is a terrible agency to try and settle anything with. Counsel, could I ask my one remaining question that goes to the merits? It's really a follow-up to Judge Graber's question about the letter, and she asked counsel to address whether or not the letter wasn't part of the implied authority for this particular boarding and search. Yes, ma'am, and I think that was their policy, and that policy was conveyed to the owner of the vessel. So here's my question. It wasn't conveyed, that letter didn't issue at the outset, right? The vessel had already been seized. That decision had already been made before the letter issued, correct? I don't know that. I don't know if the letter was in place or coming into place as they were seizing the vessel. Because don't forget, Your Honor, eight days, there's eight days in here. But my question is, when was it received? At the time it was, we know that, right, when it was sent, and at that time the vessel had already been stopped. Yes? I believe so, but I don't know that as a fact because we have no discovery. All right, thank you. See, and the other thing to follow up on that, Judge, the crew and the boat owner were radioed that they would be reimbursed, they would be indemnified. So that was already known from the get-go. I don't know if the letter then followed that up or that letter was written as they were being towed back. I just don't know. And I don't know when it was conveyed to the owners and when it was conveyed to the government, and did the government convey that to our owners or was it conveyed by the embassy? I don't know that either. Thank you. Thank you, counsel.
judges: Pregerson, Graber, Christen